IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Joseph J. Bruzzese, Jr. and Lisa A. Bruzzese,  :    Case No. 2:12-cv-167

        Plaintiffs,  :    Judge Graham
   v.
  :
Chesapeake Exploration, LLC,
  :
        Defendant.
_____

Chesapeake Exploration, LLC,  :

        Counter-Plaintiff,  :
   v.
  :
Joseph J. Bruzzese, Jr., et al.,
  :
        Counter-Defendants.

Opinion and Order

    This case concerns the enforceability of an agreement signed by landowners to accept a lease offer from Chesapeake Exploration, LLC. Landowners Stephen and Elizabeth Albery signed an Agreement to Accept Lease Offer from Chesapeake on July 16, 2011. Under this Agreement, the Alberys and Chesapeake agreed to execute a 5-year lease for the gas and oil rights to 160 acres of property owned by the Alberys in Tuscarawas County, Ohio, with the Alberys receiving a one-time payment of $2700 per acre plus royalty payments of 17.5%. Chesapeake promised to enter into a lease with such payment terms so long as the property had marketable title and was not "undevelopable." After signing the Agreement, the Alberys soon learned of a better offer being made by a different energy company and told their attorney on July 24, 2011 that they wanted to terminate the Agreement.

    The matter is before the court on cross-motions for summary judgment solely on the issue of the enforceability of the Agreement to Accept Lease Offer. As explained below, the court finds in Chesapeake's favor that the Agreement is enforceable.

1

**I.     Background**

This suit was originally filed by landowners Joseph J. Bruzzese, Jr. and Lisa A. Bruzzese in the Court of Common Pleas of Jefferson County, Ohio. The Bruzzeses had signed the Agreement to Accept Lease Offer, and the complaint sought declaratory judgment against Chesapeake that the Agreement was not enforceable. Chesapeake removed the action to this court on the basis of diversity jurisdiction. Chesapeake then answered and filed counterclaims for breach of contract, specific performance and declaratory judgment against the Bruzzeses and approximately 75 other landowners in Eastern Ohio who had signed the Agreement. During the course of this litigation, Chesapeake has reached a settlement with all of the landowners except the Alberys. The Alberys have filed counterclaims against Chesapeake for declaratory judgment, quiet title, and slander of title.

On December 20, 2010, the Alberys signed an Agreement to Join the F&M Ohio Valley Landowners Group No. 1.[1] See Doc. #146-17. Two law firms – Fisher, Brown, Peterson & Noble, and Morscyzk & Polochak – organized and represented the landowners group. Under the Agreement to Join, landowners agreed to retain the two firms as legal counsel for the purpose of negotiating gas and oil leases. The Agreement to Join provided that if a group member ultimately signed a lease negotiated by counsel, then counsel would receive a certain rate of compensation; however, group members were not obligated to enter into a lease and could opt out of the group at any time.

Counsel for the landowners group held periodic meetings with current and prospective group members at a local high school. See Dep. of Jeffrey Brown, at 16. Mr. Albery attended such a meeting in January or February 2011. See Albery Dep. at 19. He attended another meeting a month or two later. Id. These meetings were attended by 80 to 100 people, and the discussions concerned which energy companies had shown interest in leasing land, prices per acre, royalty percentages, protecting timber and water interests in the land, the length of leases and the timetable for getting lease deals done. Id. at 19-20, 24-26. A couple more meetings followed in which landowners were updated as to the prices and percentages being offered by interested energy companies. Id. at 34-35, 38.

---

[1] In his deposition, Mr. Albery initially acknowledged that he and his wife signed the Agreement to Join on December 20, 2010. See Dep. of Stephen Albery at 29-30. He later testified that he believed the December 20, 2010 signatures belonged to some other document and not to the Agreement to Join. Id. at 45-46. In any event, Mr. Albery acknowledged that he eventually did sign the Agreement to Join, and the exhibit submitted by the Alberys' own counsel in this action as a correct copy of the Agreement to Join is the one with the December 20, 2010 signatures. See Doc. #146-17.

On April 4, 2011, the Alberys signed the Ohio Valley Landowners ("OVL") Commitment Agreement. See Doc. #142-2 at Page 44 of 120. Under the OVL Agreement, the landowner formally committed acreage to the group leasing project, with Fisher, Brown, Peterson & Noble, and Morscyzk & Polochak retained as legal counsel for the project. The landowner agreed to grant exclusive authority to counsel to coordinate and accept price bids for gas and oil leases. As a fee, counsel was to receive 6% of the bonus payments made to landowners for successfully-negotiated leases.

By late spring 2011 counsel for the landowners group determined that Chesapeake had made a suitable offer that counsel could recommend for approval to members of the group. Chesapeake and counsel for the group executed a letter of intent on June 6, 2011. See Doc. #148-1. Attached to the letter of intent were a sample Agreement to Accept Lease Offer from Chesapeake and a sample Paid-Up Oil & Gas Lease. Id. Mr. Albery recalls attending a meeting in which sample copies of the Agreement to Accept Lease Offer and the Paid-Up Oil & Gas Lease were made available for group members to inspect. See Albery Dep. at 83-86; see also Brown Dep. at 105-06, 113.

A signing event was held at the local high school in mid-June 2011. See Brown Dep. at 36-37. The Agreement to Accept Lease Offer provided that Chesapeake reserved the right to withdraw its offer if landowners did not execute and deliver the Agreement to counsel by June 17, 2011. The Alberys were on vacation and did not attend the event. See Albery Dep. at 52. After returning from vacation on about July 9, 2011, the Alberys called counsel for instructions on how to retrieve lease-related documents from a website. Id. at 52, 54.

On July 16, 2011, the Alberys printed out and signed both the Agreement to Join the F&M Ohio Valley Landowners Group No. 1 and the Agreement to Accept Lease Offer. See Doc. #142-2 at Page 42 of 120; Doc. #146-18. On the Agreement to Accept Lease Offer, the Alberys filled in the parcel numbers for the land (totaling 160 acres) that was to be leased. Where the Agreement stated that there would be a one-time bonus payment of $2400 per acre, the Alberys crossed out that amount and wrote in $2700 because they had been informed that counsel had negotiated the higher amount with Chesapeake while the Alberys were on vacation. See Albery Dep. at 52, 54-55. The Alberys then emailed to counsel the signed Agreement to Accept Lease Offer.

Immediately after the Alberys had submitted the signed Agreement, Mrs. Albery's sister told them that she had heard that other energy companies were making better offers to landowners. See Albery Dep. at 59. Under the apparent understanding that they could back out of the Agreement

3

because they believed they could still opt out of the landowners group, see id. at 53, 59-60, 76, the Alberys sent a letter to counsel on July 24, 2011 stating that they wished to terminate the Agreement to Join the F&M Ohio Valley Landowners Group No. 1 and the Agreement to Accept Lease Offer. See Doc. #146-19.

Chesapeake had prepared a Paid-Up Oil and Gas Lease with accompanying forms for the Alberys to sign. See Doc. #146-25. The Lease and forms were dated July 25, 2011. See, e.g., Doc. #146-25 at Page 15 of 32. The Alberys did not receive a copy of the forms that Chesapeake prepared for them to sign. See Albery Dep. at 87.

The Alberys then joined a different landowners group and on October 19, 2011 signed an oil and gas lease with the Shell Exploration & Production Company. See Albery Dep. at 61. On February 28, 2012, Shell informed the Alberys by letter that it had discovered during its title review that the Alberys had entered into the Agreement to Accept Lease Offer with Chesapeake. See Doc. # 146-20. Shell thus terminated the October 19, 2011 oil and gas lease.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

4

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

### III. Discussion

#### A. The Language of the Agreement

The Agreement to Accept Lease Offer from Chesapeake that the Alberys signed provided in pertinent part:

> The members of The F&M Ohio Valley Landowners Group No. 1 ("the Group"), have been offered a Paid-Up Oil and Gas Lease ("Lease") and Order of Payment by Chesapeake Exploration, L.L.C ("Chesapeake"). The offer from Chesapeake is as follows:
>
> 1) A one-time bonus payment of $2700.00 per net acre of each net acre for which title is confirmed satisfactorily to Chesapeake in its sole discretion for a Lease with primary term of five (5) years, with option to extend an additional three (3) years under the same terms and conditions.
>
> 2) A royalty to the Landowner of 17.50%, as defined in the Lease.
>
> 3) Chesapeake has agreed to lease all parcels in the group . . . that have marketable title and clear due diligence being acceptable to Chesapeake in Chesapeake's sole discretion pursuant to the terms of the Order of Payment; however, Chesapeake may decline accepting "undevelopable" acreage that is not contiguous to other Group acreage or Chesapeake acreage and is less than 1 acre in size. . . .
>
> By signing below . . . [the Landowners agree] to execute an Oil and Gas Lease (the "Lease") the form of which has been provided to the Group and its member Landowners . . . . The Landowner(s) also agree to execute any associated paperwork or forms necessary to complete the transaction including the Order of Payment

> form, W-9 forms, and Memorandum of Oil and Gas Lease form. The Landowner(s) agree that [counsel] will assist Chesapeake in preparing leases and the associated forms for execution by the Landowner(s) after Landowner(s) execution of this Agreement. Landowner(s) agree that by signing below and accepting Chesapeake's offer that Chesapeake may make direct payment to [counsel] for services rendered in regard to this transaction, pursuant to the agreement to Join F&M Landowners Group No. 1. . . .
>
> Chesapeake hereby withdraws all prior offers . . . and the offer made herein by Chesapeake is subject to withdrawal if not formally executed and delivered to [counsel] by you on or before 5:00 p.m. (EST), June 17, 2011.
>
> . . .
>
> Subject to the terms of this Agreement, Landowner agrees not to enter into any other oil and gas lease, letter of intent, agreement, negotiations to lease, or sell the oil and gas rights to any other person or company and to lease only to Chesapeake . . . .

Doc. #146-18. The Alberys filled out blank lines on the Agreement in which they stated the approximate number of acres to be leased, the county and township in which their land was located, and the parcel numbers of the land.

### B. Elements of Contract Formation

Both sides to this dispute seek summary judgment on the issue of whether the Agreement to Accept Lease Offer signed by the Alberys on July 16, 2011 is an enforceable contract. The essential elements of contract formation are an offer, acceptance, contractual capacity, consideration, manifestation of mutual assent, and legality of object and of consideration. Kostelnik v. Helper, 96 Ohio St.3d 1, 3, 770 N.E.2d 58, 61 (2002). Here, the Agreement to Accept Lease Offer required that the parties enter into a further agreement, namely, the lease. The Ohio Supreme Court has expressly held that preliminary agreements are valid if the elements of contract formation are satisfied: "Ohio has long recognized the general validity of preliminary agreements to lease." Normandy Place Assoc. v. Beyer, 2 Ohio St.3d 102, 105, 443 N.E.2d 161, 164 (1982) (citing cases). "It is thus not the law that an agreement to make an agreement is *per se* unenforceable. The enforceability of such an agreement depends rather on whether the parties have manifested an intention to be bound by its terms and whether these intentions are sufficiently definite to be specifically enforced. Id., 2 Ohio St.3d at 105-06, 443 N.E.2d at 164 (citing Restatement of Contracts 2d § 26; 1 Corbin on Contracts § 30).

The Alberys argue that the following elements of contract formation are not present here: offer, consideration, and manifestation of mutual assent.

1. **An Offer**

"An offer is defined as 'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" Reedy v. The Cincinnati Bengals, Inc., 143 Ohio App.3d 516, 521, 758 N.E.2d 678, 682 (Ohio Ct. App. 2001) (quoting Restatement of Contracts 2d § 24). The Alberys first argue that the Agreement stated no offer at all, but rather a vague proposition that Chesapeake would make a future offer, which would be memorialized in a lease agreement. This argument, however, is contradicted by the plain language of the Agreement. The opening paragraph of the Agreement stated in the present tense that the "offer from Chesapeake *is* as follows." Agreement at ¶ 1 (emphasis added). The Agreement then enumerated the material aspects of the offer: price per acre, duration, royalty percentage, and marketable title. Id. The Agreement then stated that by signing the Agreement the landowners were "accepting Chesapeake's *offer*." Id. at ¶ 2 (emphasis added). The next paragraph characterized Chesapeake's offer as "the offer made herein." Id. at ¶ 3. It is true that the Agreement contemplated that the parties would later execute a lease, but that does not mean that Chesapeake failed to make an offer. The Agreement expressly identified the offer being made by Chesapeake – indeed the title of the Agreement was "Agreement to Accept Lease Offer from Chesapeake" – and executing the lease was the performance required by the Agreement. See Agreement at ¶ 2 ("By signing below . . . [the Landowners agree] to execute an Oil and Gas Lease . . . .").

The Alberys next argue that the terms of Chesapeake's offer were too indefinite to give rise to a binding contract. "[T]he essential terms of the contract, usually contained in the offer, must be definite and certain." Reedy, 143 Ohio App.3d at 521, 758 N.E.2d at 682. The Alberys focus on the terms "marketable title," "due diligence" and "undevelopable" in arguing that each of these terms had too uncertain of a meaning to manifest a willingness by Chesapeake to enter into a bargain.

The court, however, finds that the contract terms were definite and certain. The Agreement stated that Chesapeake would determine marketable title "pursuant to the terms of the Order of Payment." Agreement at ¶ 1.3. The Order of Payment in turn provided that a "title defect is a basis to render title unacceptable and shall include, but shall not be limited to, a prior unsubordinated mortgage, unreleased lease or delinquent property taxes." Doc. #146-25 at Page 28 of 32. Moreover, contract terms "'may be given precision by usage or trade or by course of dealing between the parties.'" Nilavar v. Osborn, 137 Ohio App.3d 469, 487, 738 N.E.2d 1271, 1284 (Ohio Ct. App. 2000) (quoting Restatement of Contracts 2d § 33, cmt. f). It is well-accepted that

7

"marketable title" means that "the title to the property is not subject to a claim that could result in the property holder being dispossessed." Carr v. Acacia Country Club Co., __ Ohio App.3d __, 970 N.E.2d 1075, 1089 (Ohio Ct. App. 2012). "Due diligence" in the context of real estate transactions refers to the obligation that every purchaser of real property in Ohio has to "examine the chain of title to discover the existence of adverse claims or encumbrances." Columbia Gas Transmission Corp. v. Bennett, 71 Ohio App.3d 307, 315, 594 N.E.2d 1, 6 (Ohio Ct. App. 1990). And "undevelopable" acreage (which the Agreement further restricted to parcels less than 1 acre and not contiguous to any other group acreage or Chesapeake acreage) means not fit or suitable for realizing oil or gas value from the property. See, e.g., Oxford English Dictionary (defining the verb "develop" as to "realize the potentialities of" or to "make suitable" for the intended purpose); 17 Williston on Contracts § 50:63 (4th Ed.) ("An implied covenant to explore and reasonably develop the leased premises is part of an oil and gas lease unless the lease provides otherwise.").

The Alberys' next argument is that no offer was made because two of the terms were uncertain and subject to change. The Alberys note that the price per acre of the bonus payment increased from $2400 to $2700 and that they submitted the Agreement after what they call the June 17, 2011 "deadline." The court again disagrees. That Chesapeake agreed to an increase in the price per acre does not make the Agreement uncertain or unenforceable. It means that the Alberys successfully made a counter offer that Chesapeake accepted. See Brown Dep. at 120 (attorney for landowners group stating that they negotiated with Chesapeake to increase the amount to $2700 per acre upon hearing that Chesapeake was offering another landowners group $2700). And the "deadline" was not a date after which the parties could not contract. Rather, June 17, 2011 was simply the date to which Chesapeake promised it would hold its offer open. Chesapeake opted, as it had the ability to do, to extend the offer beyond that date. See Agreement ¶ 3.

Accordingly, the court finds that Chesapeake made a valid offer in the Agreement.

### 2. Consideration

Consideration is a bargained-for legal benefit or detriment. See Kostelnik, 96 Ohio St.3d at 3, 770 N.E.2d at 61. "Consideration may consist of either a detriment to the promisee or a benefit to the promisor. . . . A benefit may consist of some right, interest, or profit accruing to the promisor, while a detriment may consist of some forbearance, loss, or responsibility given, suffered, or undertaken by the promisee." Williams v. Ormsby, 131 Ohio St.3d 427, 431, 966 N.E.2d 255, 259 (2012).

The Alberys argue that Chesapeake provided no consideration because it was not obliged to pay the bonus payment until the lease was executed. However, consideration need not come in the form of monetary payment. In the Agreement, Chesapeake promised to take on the responsibility of preparing and executing the lease. The consideration provided by Chesapeake was not a promise to pay the bonus, but a promise to execute a lease with the bonus payment as one of its terms. Chesapeake thus took on an obligation (to prepare and execute the lease) that it was not otherwise obligated to take on. See 3 Williston on Contracts § 7:4 ("[I]t is a sufficient legal detriment to the promisee if it promises or performs any act, regardless of how slight or inconvenient, which it is not obligated to promise or perform so long as it does so at the request of the promisor and in exchange for the promise. . . . [Detriment] means giving up something which the promisee was theretofore privileged to retain, or doing or refraining from doing something which the promisee was then privileged not to do, or not to refrain from doing.").

The Alberys next argue that Chesapeake's promise to perform was illusory because the Agreement gave Chesapeake unfettered discretion to decide whether to enter into the lease. The Agreement stated that Chesapeake would determine in its "sole discretion" whether a parcel had marketable title "being acceptable to Chesapeake" and would also determine whether acreage was undevelopable. The Alberys argue that this discretion gave Chesapeake an unlimited ability to walk away from the deal.

The court finds that Chesapeake's promise to perform was not illusory. "[A] contract is illusory only when by its terms the promisor retains an unlimited right to determine the nature or extent of his performance; the unlimited right, in effect, destroys his promise and thus makes it merely illusory." Domestic Linen Supply & Laundry Co. v. Kenwood Dealer Group, Inc., 109 Ohio App.3d 312, 316, 672 N.E.2d 184, 186 (Ohio Ct. App. 1996) (internal quotation marks omitted); see also 3 Williston on Contracts § 7:7 ("[W]here the promisor may perform or not, solely on the condition of his whim, his promise will not serve as consideration."). The Agreement did not leave to Chesapeake's whim the decision of whether it would enter into a lease. Instead, the Agreement provided standards by which Chesapeake was to determine whether land was acceptable for leasing – that it had marketable title, cleared due diligence, and was not undevelopable. As discussed above, these standards are capable of being defined and applied. To the extent that the "sole discretion" language may suggest otherwise, Ohio law imposes an implied duty on parties to a contract to act in good faith in its performance. See Illinois Controls, Inc. v. Langham, 70 Ohio St.3d 512, 520, 639 N.E.2d 771, 778 (1994) (holding that exclusive marketing rights contract was not illusory, even

though it did not set forth the marketing obligation, because there was an implied good-faith promise to use reasonable efforts to promote the product – "The promise to perform such an undertaking is neither illusory nor indefinite."); Restatement of Contracts 2d § 205; Lowe's Home Centers, Inc. v. LL & 127, LLC, 147 Fed. App'x 516, 523-24 (6th Cir. 2005) (noting under Michigan law that "where the manner of performance under a contract is left to the discretion of a party, that party may breach the contract by exercising its discretion in bad faith"). Thus, were it the case that Chesapeake declined to lease land based on a determination made in bad faith as to marketable title, the landowner would have a cause of action against Chesapeake for breach of the Agreement.

Finally, the Alberys argue that Chesapeake did not provide consideration because Chesapeake failed to give them the lease and accompanying forms. This argument fails for two reasons. First, it mistakes consideration with performance. The consideration was Chesapeake's promise to prepare the lease and forms; the performance was Chesapeake's acts of preparing and delivering them to the Alberys. Second, this argument mischaracterizes the factual record. Chesapeake did prepare the lease and accompanying forms for the Alberys to sign on July 25, 2011. See Doc. #146-25. It appears that the prepared lease and forms did not get delivered to the Alberys because they had notified their attorney on July 24, 2011 that they wished to terminate the Agreement. See Doc. #146-19.

Accordingly, the court finds that the Agreement was supported by consideration.

### 3. Manifestation of Mutual Assent/Meeting of the Minds

In the case of preliminary agreements, as with all contracts, the parties must manifest an intention to be bound by its terms in order for the agreement to be enforceable. Normandy Place, 2 Ohio St.3d at 105-06, 443 N.E.2d at 164. This requirement of mutual assent is also called a meeting of the minds. See e.g., Costner Consulting Co. v. U.S. Bancorp, 195 Ohio App.3d 477, 482, 960 N.E.2d 1005, 1009-10 (Ohio Ct. App. 2011); Restatement of Contracts 2d § 17, cmt. c. "A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract," Kostelnik, 96 Ohio St.3d at 3-4, 770 N.E.2d at 61, and is "usually demonstrated by an offer and acceptance." Reedy, 143 Ohio App.3d at 521, 758 N.E.2d at 682. "Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance. . . . The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by the failure to act." McSweeney v. Jackson, 117 Ohio App.3d 623, 631, 691 N.E.2d 303, 308 (Ohio App. Ct. 1996) (quoting Restatement of Contracts 2d §§ 18, 19(1)). "There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to

their manifestations and (a) neither party knows or has reason to know the meaning attached by the other . . . ." Restatement of Contracts 2d § 20(1)(a).

The Alberys make three arguments in support of their assertion that they did not have a meeting of the minds with Chesapeake. They first contend that they understood, based on the Agreement to Join the landowners' group and on representations made by counsel for the landowners' group, that the Agreement was not binding and that they could opt out of the deal at any point before signing the lease. See Albery Dep. at 56, 60, 76 (testifying that the landowners' attorney told the Alberys that they could get out of the group and out of the Agreement at any time before signing the lease). This argument fails because an objective standard applies to the determination of whether there was a meeting of the minds. "Ohio law does not require contracting parties to share a subjective meeting of the minds to establish a valid contract; otherwise, no matter how clearly the parties wrote their contract, one party could escape its requirements simply by contending that it did not understand them at the time. What it does require is that the terms of the agreement establish an objective meeting of the minds, which is to say that the contract was clear and unambiguous." 216 Jamaica Avenue, LLC v. S & R Playhouse Realty Co., 540 F.3d 433, 440 (6th Cir. 2008) (citing Nilavar v. Osborn, 127 Ohio App.3d 1, 711 N.E.2d 726, 733 (1998)). See also Bennett v. Heidinger, 30 Ohio App.3d 267, 268, 507 N.E.2d 1162, 1164 (Ohio Ct. App. 1986) ("The relevant inquiry is the manifestation of intent of the parties as seen through the eyes of a reasonable observer, rather than the subjective intention of the parties.").

The Alberys have not cited any evidence in support of their argument other than their own subjective understanding. The "mental reservation of a party to a bargain does not impair the obligation he purports to undertake." Restatement of Contracts 2d § 17, cmt. c. It is true that the Agreement to Join the landowners' group contained opt-out language, but Chesapeake was not a party to the Agreement to Join and, in any event, the Agreement to Join stated only that the landowner could opt out of the group – it did not state that the landowner could opt out of an executed Agreement to Accept Lease Offer. The agreement that Chesapeake seeks to enforce here, the Agreement to Accept Lease Offer was clear and unambiguous. It contained no language suggesting that the landowner could opt out of the deal before signing the lease. It plainly stated that the landowner was agreeing to execute a lease with Chesapeake and agreeing not to take any actions inconsistent with the grant of rights to Chesapeake by entering into negotiations or an agreement with any other person or energy company.

The second argument made by the Alberys regarding a meeting of the minds is that they were not made aware of an essential term of the lease before signing the Agreement to Accept Lease Offer.  This argument too is unavailing.  An enforceable contract must be specific "as to its essential terms, such as the identity of the parties to be bound, the subject matter of the contract, consideration, a quantity term, and a price term."  Alligood v. Procter & Gamble Co., 72 Ohio App.3d 309, 311, 594 N.E.2d 668, 669 (Ohio Ct. App. 1991); see also Allied Erecting & Dismantling Co. v. Uneco Realty Co., 146 Ohio App.3d 136, 142, 765 N.E.2d 420, 425 (Ohio Ct. App. 2001).  The Agreement contained the identity of the parties, the parcels to be leased for gas and oil rights, the consideration (mutual promises to enter into a lease, with Chesapeake agreeing to prepare the lease with certain terms and the Alberys agreeing to execute the lease and refrain from negotiating with others), the price terms, and the duration of the lease.  The Alberys point to a surrender clause (concerning Chesapeake's ability to terminate the lease) that appeared in the lease but was absent from the Agreement.  See Doc. # 146-24 at Pages 4 and 5 of 32.  They have not explained why the surrender clause was an essential term, but even if it were, the evidence demonstrates that the terms of the lease were made available to the Alberys before they signed the Agreement.  The Alberys acknowledge having attended a meeting in which a sample of the lease was made available for inspection, see Albery Dep. at 83-86, and counsel for the landowners testified that at the meetings he "explained to the crowd what the terms were in the lease and what was going to happen," see Brown Dep. at 105.  Chesapeake provided the lease with the surrender clause to the Alberys before they signed the Agreement.  That the Alberys chose not to read the lease and thus held a subjective belief that Chesapeake could not terminate the lease does not mean that the parties failed to reach an objective meeting of the minds.

The Alberys' third argument is that Chesapeake did not manifest its assent because it did not sign the Agreement.  Though parties ordinarily manifest their assent to a written contract by signing it, a party may manifest its assent by some other act or conduct.  See Restatement of Contracts 2d § 19(1) ("The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act."); Detroit Tigers, Inc. v. Ignite Sports Media, LLC, 203 F.Supp.2d 789, 796 (E.D. Mich. 2002).  A signature is not required unless the parties agree that their written agreement be signed.  Tocci v. Antioch Univ., __ F.Supp.2d __, 2013 WL 4517838, at *20 (S.D. Ohio 2013); Detroit Tigers, 203 F.Supp.2d at 796 ("A signature on the contract is not a *per se* prerequisite to enforcement. . . . The real question is . . . what was the intention of the parties . . . .") (internal quotation marks omitted); Leibowitz v. Cornell Univ., 584 F.3d 487, 507 (2d Cir. 2009),

12

*superseded on other grounds* (holding that a "signature is not required to demonstrate assent" where the party's conduct objectively demonstrated her assent).

A party's conduct demonstrates assent when "he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." Restatement of Contracts 2d § 19(2); see also Tocci v. Antioch Univ., __ F.Supp.2d __, 2013 WL 4517838, at *20 (holding an agreement to be enforceable, despite one party's later refusal to sign it, because the refusing party had earlier given an objective manifestation of his assent to be bound). Here, Chesapeake gave several indications that it intended to be bound by the Agreement. It entered into, with counsel for the landowners, a letter of intent detailing the terms and procedure for acquiring lease rights, including the step of executing the Agreement to Accept Lease Offer. See Doc. #148-1. Chesapeake produced a form copy of the Agreement to the landowners' counsel, with the express instruction that it be distributed to the landowners at their meetings. See Doc. #148-1, ¶ 4.B. Chesapeake then accepted the landowners' counter-offer that the price of the bonus payment be increased from $2400 to $2700 per acre. Finally, Chesapeake held open the offer period for the Alberys when they returned from vacation.

Accordingly, the court finds that the Alberys and Chesapeake both manifested their intent to be bound by the Agreement to Accept Lease Offer, and, for the reasons stated above, the parties formed an enforceable contract.

### C. Notarization

Finally, the Alberys argue that the Agreement is not enforceable because it was not notarized in compliance with Ohio Revised Code § 5301.01. This argument has no merit. Section 5301.01 provides that deeds, mortgages and "leases of any interest in real property" shall be signed by the grantor, mortgagor or lessor and be notarized. O.R.C. § 5301.01(A). Plainly, the Agreement to Accept Lease Offer is not a lease, but an agreement to enter into a lease. The Alberys have cited no legal authority for the proposition that § 5301.01 applies to the Agreement.

### IV. Claims Disposed of by the Court's Ruling on Enforceability

Discovery and motions practice was divided into two phases, with Phase I relating to the legal issue of the enforceability of the Agreement to Accept Lease Offer. See Preliminary Pretrial Order (doc. #127). Having held that that the Agreement is enforceable, the court finds that Chesapeake is entitled to summary judgment on its claim for declaratory judgment – that the Agreement is valid, that the Alberys are obligated under the Agreement to convey an oil and gas

lease to Chesapeake, and that Chesapeake's claim to the oil and gas rights underlying the Alberys' parcels is legitimate. Chesapeake is further entitled to summary judgment against the Alberys' counterclaim for declaratory judgment regarding Chesapeake's interest in the subject property.

The court notes that Chesapeake's motion requests, without further support or elaboration, that it be granted summary judgment on its claims for breach of contract, specific performance and accounting, and for an award of costs and attorneys' fees. However, the parties have not briefed whether a ruling on the enforceability issue would necessarily require a ruling in Chesapeake's favor on those causes of action.

The parties are instructed to confer with the magistrate judge to develop a discovery and briefing schedule.

### V. Conclusion

Accordingly, Chesapeake's motion for partial summary judgment as to the issue of the enforceability of the Agreement (doc. #148) is GRANTED, and the Alberys' motion for partial summary judgment (doc. #144) is DENIED.

s/ James L. Graham  
JAMES L. GRAHAM  
United States District Judge

DATE: February 13, 2014